SUNDERLAND v. UNITED STATES. STICKEL v. SAME. MATTERS v. SAME.

Circuit Court of Appeals, Eighth Circuit. April 8, 1927.

Nos. 6723, 6725, 6735.

1. Criminal law ⬪970(1)—Indictment and information ⬪133(1)—Indictment cannot be attacked by motion to exclude evidence, or by motion in arrest of judgment.

Indictment cannot be attacked in federal courts, at least in the Eighth circuit, by motion to exclude evidence, or by motion in arrest of judgment.

2. Indictment and information ⬪125(1)— "Duplicity" is the joining in one count of two or more distinct offenses.

"Duplicity" is the joining in one count of two or more distinct offenses.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Duplicity.]

3. Indictment and information ⬪125(19)—Indictment for conspiracy and use of mails to defraud by sale of corporate securities held not duplicitous because it set out various means (Criminal Code, §§ 37, 215 [Comp. St. §§ 10201, 10385]).

Indictment under Criminal Code, §§ 37, 215 (Comp. St. §§ 10201, 10385), for conspiracy and for use of the mails to defraud by sale of corporate securities, held not duplicitous because it alleged various complex means and subsidiary schemes by which main scheme to defraud was carried out.

4. Indictment and information ⬪73(1)—"Repugnancy" consists in contradiction between material allegations in count of indictment.

"Repugnancy" in a count of an indictment consists in a contradiction between material allegations therein.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Repugnancy.]

5. Indictment and information ⬪73(3)—Indictment for use of mails to defraud by sale of securities, alleging scheme to hold corporation out as owner of lands, that defendants represented themselves as owners, and that corporation was not owner, held not invalid for "repugnancy" (Criminal Code, §§ 37, 215 [Comp. St. §§ 10201, 10385]).

Indictment under Criminal Code, §§ 37, 215 (Comp. St. §§ 10201, 10385), for conspiracy and for use of mails to defraud by sale of corporate securities, held not invalid for repugnancy, because it alleged that it was part of the scheme that corporation should hold itself out as the owner of certain lands, that in carrying out scheme defendants represented that they themselves owned the lands, and that in fact corporation was not the owner of the lands, since all of such allegations might be true.

**6. Post office ☜50—Court's statement that indictment charged defendants with issuing and by use of mails selling securities fraudulently issued against colorable land title held unfair statement of charge (Criminal Code, §§ 37, 215 [Comp. St. §§ 10201, 10385]).**

In prosecution, under Criminal Code, §§ 37, 215 (Comp. St. §§ 10201, 10385), for conspiracy and for use of mails to defraud by sale of corporate securities, trial court's statement, preliminary to examination of jurors, that indictment charged defendants with having fixed up colorable claim of title to land and caused bonds to be issued against it, which they sold to public by false representations or devices amounting to deceitful practices used mails to carry out fraudulent plan, held not a fair statement of charge in indictment, and effect thereof prejudicial to defendants.

**7. Criminal law ☜722(2)—In prosecution for conspiracy and use of mails to defraud, prosecuting attorney's statement that one of defendants was fugitive from justice held improper (Criminal Code, §§ 37, 215 [Comp. St. §§ 10201, 10385]).**

In prosecution, under Criminal Code, §§ 37, 215 (Comp. St. §§ 10201, 10385), for conspiracy and for use of mails to defraud by sale of corporate securities, statement by prosecuting attorney, in opening statement to jury, that one defendant was fugitive from justice, held improper; such evidence being inadmissible, even if true.

**8. Criminal law ☜1037(2)—Defendants were not required to request instruction to disregard prosecuting attorney's statement, approved by court.**

Defendants' counsel was not required to request court to instruct jury to disregard improper remark of prosecuting attorney in his opening statement, where such remark had received approbation of court, and where it was doubtful whether harm caused thereby could be thus remedied.

**9. Post office ☜50—Trial court's statement interpreting indictment for conspiracy and use of mails to defraud by securities sales held unfair.**

Statement by trial court, explaining charge in indictment for conspiracy and use of mails to defraud by sales of securities, made in disposing of motions by defendants after prosecuting attorney's opening statement, held not a fair judicial interpretation of indictment.

**10. Criminal law ☜699—Court's interruptions of defendants' counsel during opening to jury, and restrictions thereon, held improper (Criminal Code, §§ 37, 215 [Comp. St. §§ 10201, 10385]).**

In prosecution, under Criminal Code, §§ 37, 215 (Comp. St. §§ 10201, 10385), for conspiracy and for use of mails to defraud by sale of corporate securities, trial judge's repeated interruptions of defendants' counsel during course of latter's opening statement to jury, and restrictions on presentation of defenses, held to deprive them of fair opportunity to outline defense to which they were entitled.

**11. Criminal law ☜855(8)—Misconduct of juror in conversing with government witness during trial created rebuttable presumption that communications were prejudicial.**

It was a rebuttable presumption that conversations between one of jurors and a government witness during course of trial, contrary to court's instructions, was prejudicial to defendants, and, in absence of evidence rebutting presumption, such misconduct created at least a grave doubt whether defendants' right to trial by impartial jury was not infringed.

**12. Witnesses ☜268(1)—Right to cross-examine should not be lightly curtailed.**

Right of defendants to cross-examine important government witness should not be lightly curtailed, especially where cross-examination is not unduly extended, nor inquiry made respecting immaterial matters.

**13. Criminal law ☜760—In prosecution for use of mails to defraud by sales of securities, court's illustration of legal principles by hypothetical "gold brick" swindle held prejudicial (Criminal Code, §§ 37, 215 [Comp. St. §§ 10201, 10385]).**

In prosecution, under Criminal Code, §§ 37, 215 (Comp. St. §§ 10201, 10385), for conspiracy and for use of mails to defraud by sale of corporate securities, trial court's illustration of principles of law involved by stating a hypothetical "gold brick" swindle case held prejudicial to defendants.

**14. Criminal law ☜776(5)—Defendant is entitled to instruction that purpose of good character evidence is to raise reasonable doubt, and to acquit if reasonable doubt is created.**

Where evidence of defendant's good character is introduced on defendant's behalf, he is entitled, especially if request is made, to instruction that purpose and function of such evidence is to generate a reasonable doubt of defendant's guilt, regardless of whether other evidence in case be clear or doubtful, and that, if reasonable doubt is created thereby, when considered with other evidence, he is entitled to acquittal.

**15. Criminal law ☜810—Instruction that success of scheme to defraud in use of mails to sell securities required men of reputation nullified effects of good character instruction (Criminal Code, §§ 37, 215 [Comp. St. §§ 10201, 10385]).**

In prosecution under Criminal Code, §§ 37, 215 (Comp. St. §§ 10201, 10385), for conspiracy and for use of mails to defraud by sale of corporate securities, in which one of defendants introduced evidence of good character, giving of instruction that success of fraudulent scheme required that some men of reputation and standing be involved therein held improper, and nullified any good effects of previous instruction as to effects to be given evidence of defendants' good character.

**16. Criminal law ☜807(1)—Court's instructions to jury should not be argumentative.**

Though federal judge may comment on the evidence and express his opinion on the facts, if he clearly leaves to jury the decision of the

fact questions, instructions should not be argumentative, and as judge cannot direct a verdict of guilty in criminal cases, even if acts are undisputed, he should not be permitted to do indirectly what he cannot do directly, and by his instructions argue jury into verdict of guilty.

**17. Criminal law ⚖=807(1)—Instruction containing expression, "the evidence justifies the claim of the government," held argumentative.**

Instruction which contained expressions that "the evidence justifies the claim of the government," "the government is justified apparently in claiming," "the evidence further discloses," "it is further shown to me clearly by the evidence," "the evidence would further indicate to me," and "I find little dispute about it in the testimony," *held* to render entire charge argumentative.

**18. Criminal law ⚖=1030(1)—In determining whether fair trial was had, appellate court may examine whole record, without regard to objections.**

In determining whether a fair trial was had, the Circuit Court of Appeals may examine the record as a whole, without regard to objections.

**19. Criminal law ⚖=633(1)—"Fair trial" is one in substantial conformity to law, before impartial tribunal, with opportunity to defend, and adequate instructions; "impartial."**

"Fair trial" means a trial conducted in substantial conformity to law, before an impartial judge and an impartial jury, in an atmosphere of judicial calm, that prosecuting attorney's language and acts are subject to control, that defendant shall have fair opportunity to outline defense to jury, that right of cross-examination shall be respected, and that judge will not extend his activities so far as to become in effect either an assisting prosecutor or a thirteenth juror, and that if evidence of defendant's good character is introduced an adequate instruction should be given respecting the probative value thereof, "impartial" meaning being indifferent as between the parties.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Fair Trial; Impartial.]

**20. Criminal law ⚖=633(1)—Record in prosecution for conspiracy and use of mails to defraud by sales of securities held to show that defendants did not have fair trial (Criminal Code, §§ 37, 215 [Comp. St. §§ 10201, 10385]).**

In prosecution under Criminal Code, §§ 37, 215 (Comp. St. §§ 10201, 10385), for conspiracy and for use of mails to defraud by sale of corporate securities, record *held* to show that defendants did not have a fair and impartial trial, to which they were entitled.

**21. Post office ⚖=50—Whether defendant had severed his connection with fraudulent scheme to defraud by use of mails before indictment held for jury (Criminal Code, §§ 37, 215 [Comp. St. §§ 10201, 10385]).**

In prosecution under Criminal Code, §§ 37, 215 (Comp. St. §§ 10201, 10385), for conspiracy and for use of mails to defraud by sale of corporate securities, whether one of defendants

had severed his connection with scheme more than three years before return of indictment, so as to bar prosecution against him, *held*, under the evidence, for jury.

In Error to the District Court of the United States for the District of Nebraska.

Ralph E. Sunderland, Walter L. Stickel, and Thomas H. Matters[1] were convicted of conspiracy and of use of mails to defraud, and they separately bring error. Judgment set aside, and new trial granted.

James A. Reed, of Kansas City, Mo. (Gurley, Fitch & West, of Omaha, Neb., and Marcy K. Brown, Jr., of Kansas City, Mo., on the brief), for plaintiff in error Sunderland.

Norris Brown, of Omaha, Neb. (Albert W. Jefferis and George M. Tunison, both of Omaha, Neb., on the brief), for plaintiff in error Stickel.

Halleck F. Rose, of Omaha, Neb. (Abel V. Shotwell, of Omaha, Neb., on the brief), for plaintiff in error Matters.

James C. Kinsler, U. S. Atty., of Omaha, Neb., and Sylvester R. Rush, Sp. Asst. Atty., Gen., for the United States.

Before WALTER H. SANBORN, KENYON, and BOOTH, Circuit Judges.

BOOTH, Circuit Judge. There are here three writs of error to a judgment of conviction of plaintiffs in error under an indictment charging them and a number of other defendants with violations of section 215 and 37 of the Criminal Code (Comp. St. §§ 10201, 10385). The three writs of error are based upon a common record, and the questions involved are largely the same in each case. They will therefore be considered together, except where separate treatment is necessary of questions relating to a particular case.

The indictment contained 11 counts. Each of the first 10 charged a scheme to defraud and a separate use of the United States mail for the purpose of executing the scheme. The eleventh count charged a conspiracy to commit the substantive offenses charged in the first 10 counts, and the doing of certain acts to effect the object of the conspiracy. The material parts of count 1 of the indictment are set out in the margin.[1] Plaintiffs in error were convicted on all counts except the first.

[1] That Willard V. Mathews, Lucien B. Fuller, Alexander L. Mathews, Charles H. Rogers, Harris L. Fuller, Samuel G. Moore, Le Robert D. Eykelboom, Walter L. Stickel, Ralph E. Sunderland, Harold R. Cozier, Walter A. George, James B. Ellison, George L. Roach, Homer Molyneux, Thomas H. Matters, Vogel Gettier, H. W. Sewall, whose christian name is to the Grand Jurors unknown, Howard A. Sharrick, John F. Hecox, Thomas M. Finney, Ed. G. Smith, James G. Cloud, William H. Culver, Charles

The trial of the case lasted more than six weeks. The record is voluminous, consisting of 2,500 printed pages. The assignments of error on behalf of defendant Sunderland are 357 in number; those on behalf of the other plaintiffs in error are to a considerable extent, but not wholly, covered by those in behalf of Sunderland. To discuss them all would be impractical and would serve no useful purpose. They may be grouped roughly as follows: Those challenging the rulings as to the sufficiency and validity of the indictment. Those relating to the conduct of the trial and the character of the proceedings during the same. Those relating to questions of evidence. Those relating to the charge to the jury.

### Duplicity.

[1] The first attack made on the indictment is that each of the counts is duplicitous. The attack was not made in the court below in the classic ways: by motion to quash or by demurrer; but instead, by motion to exclude any evidence, motion to require the government to elect at the close of the evidence, motion for a directed verdict, and motion in arrest of judgment.

The first method of attack is not recognized in the federal courts, at least in this circuit. Morris v. United States (C. C. A.) 161 F. 672, 678; McSpadden v. United States (C. C. A.) 224 F. 935; McKnight v. United States (C. C. A.) 252 F. 687; Boone v. United States (C. C. A.) 257 F. 963. And the last method of attack is equally unavailable. Connors v. United States, 158 U. S. 408, 411, 15 S. Ct. 951, 39 L. Ed. 1033; Morgan v. United States (C. C. A.) 148 F. 189; Lemon v. United States (C. C. A.) 164 F. 953, 958; Chew v. United States (C. C. A.) 9 F.(2d) 348, 353.

Rudolph and Alf L. Steinert, hereinafter called defendants, on and prior to January 1, 1919, did devise a scheme and artifice to defraud, and for obtaining money and property, by means of false and fraudulent pretenses, representations and promises, from a certain class of persons then resident in divers States of the United States, that is to say, those persons, who, by the means hereinafter described, should be induced by the defendants to purchase and pay for the stock, bonds, certificates and other securities and evidences of indebtedness issued or thereafter to be' issued by the corporations and banks hereinafter named and described, then, or thereafter to be, under the control and management of the defendants as hereinafter set forth, and those persons, who, by said means, should be induced to loan, entrust, deposit or invest money and property to or with the said corporations and banks, or some or either of them, and thereby to part with and yield up their money and property to the defendants, under their own names or under the name or names of the said corporations and banks, respectively, upon and by means of certain pretenses, representations and promises hereinafter set forth, to be made by the defendants to said persons orally and through and by means of printed circulars, newspapers advertisements, letters and publications, and through agents; that the defendants Willard V. Mathews, Lucien B. Fuller, Alexander L. Mathews, Charles H. Rogers, Harris L. Fuller, Samuel G. Moore, Le Robert D. Eykelboom, Harold R. Cozier, George L. Roach, Homer Molyneux, Vogel Gettier, H. W. Sewall, whose christian name is to the Grand Jurors unknown, Howard A. Sharrick, John F. Hecox, Thomas M. Finney, Ed. G. Smith, James G. Cloud and Alf L. Seinert, on and prior to January 1, 1919, were stockholders, officers, employees and agents, exercising the complete control, management and direction of the following named corporations and banks then and theretofore organized and existing under and by virtue of the laws of the State of Nebraska, to-wit: the Guaranty Securities Company of Omaha, Nebraska, having its principal offices and place of business at Omaha and Lincoln in said State; the Pioneer State Bank of Omaha, Nebraska; the Midland Savings Bank of Lincoln, Nebraska, and the Farmers State Bank of College View, Nebraska; the following named corporation and bank then and theretofore organized and existing under and by virtue of the laws of Colorado, to-wit: the Guaranty Securities Company of Denver, Colorado; and the Denver State Bank of Denver, Colorado; and the following named corporation then and theretofore organized and existing under and by virtue of the laws of the State of Iowa, to-wit: The Guaranty Securities Company of Des Moines, Iowa;

#### [Details of the Scheme]

and the said scheme and artifice so devised by the defendants as aforesaid was that the said defendants, in the control, management and direction of the aforesaid corporation and banks, should together with the defendants Walter L. Stickel, Ralph E. Sunderland, Walter A. George, James B. Ellison, Thomas H. Matters, William H. Culver and Charles Rudolph, promote, organize, and incorporate under the laws of the State of Delaware, a certain other corporation, to be known as the Colonial Timber and Coal Corporation, with headquarters at Charleston, West· Virginia, the control and management whereof should be acquired and exercised by the defendants; that said Colonial corporation should ostensibly have capital stock in the amount of $10,000,000, should hold itself out as the owner in fee simple of 700,000 acres of coal and timber lands in West Virginia and other States, and should issue bonds in the amount of $2,000,000, purporting to be secured by first mortgage upon 147,000 acres of said land; that the defendants should cause the said bond issue ostensibly to be underwritten and guaranteed by the said Guaranty Securities Companies, and the solvency of the said Colonial corporation and the safety and desirability of said bonds as an investment to be recommended and assured to the public by the corporations and°banks hereinbefore mentioned; that the defendants should cause large amounts of said bonds, and of the stock of the said Colonial corporation, to be sold and transferred to the corporations and banks hereinbefore mentioned, and, through said banks and corporations as selling agents, should cause other large amounts of said bonds to be sold to the general public, the proceeds of which sales to the said banks and corporations and to the general public should be appropriated to the use, benefit and gain ·of the defendants and of the said Colonial corporation; that the defendants, without paying any money or giving any other valuable consideration therefor, should cause large amounts of said stock and bonds to be allotted and transferred to themselves, thereby enabling the defendants to sell and otherwise dispose of said stock and bonds for their own gain and profit; that, in order to obtain additional money and property to be appropriated to the use, gain and profit of the defendants in the operations aforesaid, the defendants should cause the corporations and banks hereinbefore mentioned to issue and sell to the general public large amounts of stock, bonds, certificates, and other securities and ;evidences of

[2, 3] Assuming, but without deciding, that the other methods were sufficient to raise the question of duplicity, yet we think the charge cannot be sustained. Duplicity is the joining in one count of two or more distinct offenses. In the case at bar the contention of plaintiffs in error is that the indictment sets out two schemes to defraud; that it sets out two groups of defendants; each group being engaged in a separate scheme—one group being engaged in the sale of securities of the Guaranty Securities Company and its allied companies and banks, the other group being engaged in the sale of securities issued by the Colonial Timber & Coal Corporation.

This contention fails to grasp the full scope of the indictment. The offense charged in each count, except the conspiracy count, is the use of the mail in furtherance of a scheme for obtaining money by means of false and fraudulent representations. The indictment alleged that one group of defendants were in control of certain trust companies and banks; that they, in co-operation with a second group of defendants, devised a scheme in accordance with which they should form a new corporation, the Colonial Timber & Coal Corporation; that this new corporation, under the co-operative management of all the defendants, should issue its stock and bonds and sell a portion of the same to the financial institutions controlled by the first group of defendants; that another portion should be sold to the general public through the same financial institutions; that still a third portion should be allotted without consideration to the

---

indebtedness, and to solicit and obtain large sums of money in deposits and loans from the public generally;

[Representations Made]

that the false and fraudulent pretenses, representations and promises, so to be made by the defendants as aforesaid, in pursuance of the said scheme and artifice, and which were by the defendants intended to be understood, believed and relied upon by the persons so to be defrauded as aforesaid, were as follows, to-wit:

That the officers, directors, committees and advisers of said banks and corporations were and would be men of the highest integrity and ability, with years of successful experience in banking and securities companies and in other similar lines of business, who could be relied upon to conform strictly to sound business principles;

That the affairs of the said banks and corporations had been, were being, and would be administered with due regard for the best interests of those persons who should invest or deposit their money and property with them, and in accordance with safe and conservative business methods;

That said banks and corporations, and those in the management and control thereof, were not promoters or speculators, but were mortgage and bond bankers, loaning their own funds direct to mortgagors upon improved income-producing real estate;

That all of said corporations and banks, controlled and managed by the defendants as aforesaid, were solvent and had assets largely in excess of their liabilities, and were possessed of large resources and amply able to carry out any and all of their financial obligations;

That the bonds issued by the said Guaranty Securities Companies and purporting to be first mortgage bonds, were directly and amply secured by deposits, with a bonded trustee, of real estate first mortgages upon improved, income-producing farm lands in eastern Nebraska and western Iowa, and by other first mortgages upon improved, income-producing real estate;

That the stock of the said banks and corporations, respectively, was worth largely in excess of its par value, was rapidly increasing in value, and would soon be worth at least double its par value.

That each of said banks and corporations had earned, was earning and would continue to earn large net profits, and that each said bank and corporation possessed a large surplus set aside from net earnings;

That interest upon the bonds of the said corporations, and dividends upon the capital stock of said corporations and banks, had been, were being, and would continue to be paid from the net earnings of the said corporations and banks, respectively;

That the said Pioneer State Bank had earned

---

more profits than any other bank ever organized in Omaha, Nebraska;

That each of said banks was a sound financial institution and had been, was being and would be conducted according to sound banking principles;

That the bonds, certificates, and other securities issued by the said corporations were as safe as a Government bond;

That the bonds of the said Colonial Timber and Coal Corporation, in the sum of $2,000,000, were secured by a first mortgage lien upon 140,000 acres of coal and timber land in the State of West Virginia, *of which the defendants were the owners in fee simple;*

That in addition to said 140,000 acres, directly secured by said bond issue, *the defendants were the owners in fee simple of 560,000 acres more of such coal and timber land in said State of West Virginia, which was and would be additional security for the said bond issue;*

That the total assets of the said Colonial Timber and Coal Corporation were of the value, conservatively estimated, of two and one-half times its capital stock and surplus, which said capital stock and surplus amounted to $20,000,000;

[Falsity of the Representations]

Which said pretenses, representations and promises, as the defendants, when so devising said scheme and artifice and at the time of committing the several offenses in this indictment hereinafter mentioned, well knew, were and would be false and fraudulent pretenses, representations and promises in the particulars following, to-wit:

That the officers, directors, committees and advisers of the said corporations and banks were not, and would not be, men of the highest integrity and ability, with years of successful experience in the banking and securities business, and other similar lines nor could they be relied upon to conform to sound business principles, for in truth and in fact each and all of said officers, directors, committees and advisers were and would be of little integrity or ability, with little or no experience in such lines of business who did and would conduct the affairs of said corporations and banks in an unsafe, dishonest, reckless and improvident manner, as the defendants then and there well knew;

That the affairs of the said banks and corporations had not been, were not being, and would not be administered with due regard for the best interests of those persons who should invest or deposit their money or property therein, but in truth and in fact their affairs had been, were being, and would continue to be conducted with utter disregard for the rights and interests of the persons aforesaid not in accordance with safe or conservative business methods, and solely for the personal gain and profit

defendants themselves; and furthermore, that the same financial institutions, owning among their assets large amounts of bonds and stock of the Colonial Timber & Coal Corporation, should sell to the public, stock, bonds, and certificates of their own issue, based upon their own assets, which included said stock and bonds of the Colonial Timber & Coal Corporation.

Though the scheme thus alleged was complex in its nature, and manifold in its details, it was but a single scheme in which the ties of co-operation bound together the various defendants, though some controlled one corporation and some another.

The scheme to defraud and the means by which it was to be carried out are to be distinguished from each other. Setting out the

various means did not render the count duplicitous. See Gourdain v. United States (C. C. A.) 154 F. 453, 457; Silkworth v. United States (C. C. A.) 10 F.(2d) 711, 714.

The charge of duplicity cannot be sustained.

### Repugnancy.

[4, 5] The next contention is that the indictment is invalid for repugnancy in each count. Passing by similar infirmities in practice in raising the question, it is clear that the alleged repugnancy relied upon is to be found by a comparison of those allegations of the indictment which are set forth in italics. See count 1 in margin.

It is apparent that the indictment is open to criticism for loose and careless pleading. But the technical charge of repugnancy can-

---

of the defendants, as the defendants then and there well knew;

That the said Guaranty Securities Companies, and those in the management and control thereof, were not, and would not be, engaged in the legitimate business usually transacted by mortgage and bond bankers loaning their own funds direct to mortgagors upon improved, income-producing real estate, but in truth and in fact were, and would be, promoters and speculators, engaged for the most part in illegitimate, irregular and speculative transactions, entirely inconsistent with and foreign to the customary business of mortgage and bond bankers, as the defendants then and there well knew;

That said corporations and banks were not and would not be solvent, nor were they, or either of them, possessed of large resources or amply able to carry out their financial obligations, but in truth and in fact the liabilities of each said bank and corporation were, and would be, at all times largely in excess of its assets, as the defendants then and there well knew;

That the bonds and certificates issued by the said Guaranty Securities Companies, and purporting to be first mortgage bonds and certificates, were not, and would not be, secured by first mortgages upon improved, income-producing farm lands or other real estate in eastern Nebraska and western Iowa or elsewhere, but in truth and in fact the first mortgages held by the said Companies which were, or could be, security for the payment of said bonds were inconsiderable as compared with the total amount of the bonds and certificates so issued, and wholly insufficient as security therefor, and such mortgages as were ostensibly deposited in trust as security for said bonds and certificates were, and would be, misappropriated, dissipated, and diverted to other uses, and the said bonds and certificates were, and would be, wholly devoid of safety, as the defendants then and there well knew;

That the stock of the said banks and corporations, respectively, was not, and would not be, at any time worth in excess of its par value, nor would or did the same increase in value, but in truth and in fact the said stock was, and would be, of value at all times less than par and was, and would be, constantly declining in value, and rapidly becoming worthless, as the defendants then and there well knew;

That said banks and corporations had neither of them earned, nor would they earn, any net profits, nor did they, or would they, either of them, possess a surplus set aside from net earnings, but in truth and in fact there were and would be no earnings from which a surplus could be set aside, and no earnings sufficient to pay interest upon the bonds and certificates issued by said corporations and banks, respectively, or from which dividends had

been, or could be, legitimately paid upon the stock of said corporation and banks, and any such dividend that had been or should be, paid upon said stock was, and would be, paid from capital, as the defendants then and there well knew;

That said banks were and would be, neither of them, sound financial institutions, nor had they been, or would they be, conducted according to the sound banking principles, but in truth and in fact they were, and would be, engaged in speculative, insecure and questionable enterprises and transactions, wholly in conflict with accepted banking rules and principles, and were, and would be, unsound and unsafe, as the defendants then and there well knew;

*That the said Colonial Timber and Coal Corporation was not, nor would it be, the owner in fee simple of 700,000 acres of coal and timber land in the State of West Virginia or elsewhere, nor were or would its bonds in the sum of $2,000,000, or in any other amount, be secured by deed of trust of 147,000 acres or any quantity of such land* to which the said Colonial corporation had, or would have, any valid or merchantable title or claim whatever, but in truth and in fact the said Colonial corporation was not, nor would it be, the owner in fee of any land or timber and coal land in West Virginia or elsewhere, and any claim of title set forth by it or any of its incorporators or promoters to any such land was, and would be, wholly speculative, fictitious and fraudulent, and the said bonds were, and would be, wholly devoid of security, as the defendants then and there well knew;

That said Colonial corporation did not, and would not, have paid up capital and surplus in the sum of $20,000,000, nor did it, or would it, have assets of the value of two and one-half times said sum, but in truth and in fact the said Colonial corporation had and would have no paid up capital or surplus whatever, and was, and would be, wholly without assets of any value whatsoever, as the defendants then and there well knew;

[Use of the Mail]

And the Grand Jurors aforesaid, upon their oath aforesaid, do further present, that said defendants, on March 25, 1920, at the City of Omaha, in said division and district, for the purpose of executing said scheme and artifice, unlawfully, willfully, knowingly and feloniously, did place and cause to be placed a certain letter in the Post Office of the United States there, to be sent and delivered by the Post Office establishment of the United States to one of said persons of said class of persons, that is to say, a letter then and there addressed to one Alfred Cornish, 1208-10 Farnam St., Omaha, Nebraska.

not be sustained. Repugnancy in a count consists in a contradiction between material allegations therein. There is no such contradiction here, even assuming that the exact legal ownership of the land was a material matter. Each of the allegations in question might be true. The first is that it was part of the scheme that the Colonial Timber & Coal Corporation should hold itself out as the owner of certain lands. The second is that in carrying out the scheme defendants represented that *they themselves* were the owners of the lands. The third is that in truth and fact the Colonial Timber & Coal Corporation was not the owner of the lands.

Since all three of the allegations might be true, there was consequently, no repugnancy. What might have been the result of this loose pleading in the way of restricting the introduction of evidence, if proper objection had been made, we are not called upon to decide; nor are we called upon to determine what might have been the result upon the validity of the count if the representation as to ownership of land had been the only alleged false representation relied upon. But such was not the case. All we decide is that the count was not void for repugnancy. See 31 C. J. p. 665; Lehman v. United States (C. C. A.) 127 F. 41; Colburn v. United States, 223 F. 590 (C. C. A. 8); Malvin v. United States (C. C. A.) 252 F. 449; Byron v. United States (C. C. A.) 259 F. 371.

Two other matters relating to the indictment—an alleged fatal variance between the allegation of the indictment and the proof, and an alleged amendment of the indictment by the court—have been discussed and disposed of in the Mathews Case (C. C. A.) 15 F.(2d) 139, which involved this same indictment. It is unnecessary to repeat what was there said.

### Was There a Fair Trial?

A second group of assignments of error call attention to certain matters which occurred in the course of the trial, which, it is claimed, resulted in plaintiffs in error not having a fair trial. Some of these matters require mention.

[6] 1. Preliminary to the examination of jurors, the court made the following statement:

"Here is a case in which an indictment has been brought by the grand jury in which a number of parties are accused and charged. It is charged against them that they fixed up an old paper title to a lot of land, title that wasn't a title, a claim of title and a colorable claim of title or the like, and, using that claim as to having or owning a lot of land down in West Virginia, I believe it is, or somewhere remote from here, that they caused bonds to be issued against it, and perhaps other kinds of securities, and that they then proceeded to sell or dispose of securities to individuals and to the public by means of either actual false representations, or devices and methods that amounted to deceitful practices, holding the securities out to be good, sound securities, whereas the claim of the charge is that they were not, and that they had a plan to defraud individuals and the public and that having such a plan they used the mails of the United States to further the plans."

We agree with the contention of plaintiffs in error that this was not a fair statement of the charge in the indictment, and that its effect was to prejudice the jurors from the start.

[7] 2. In the course of his opening statement, counsel for the government made the following statement:

"* * * And they went down to West Virginia, and they employed an attorney there by the name of Ellison, a lawyer, who also is or was indicted in this case, but who is now a fugitive from justice, as the evidence will show."

This was objected to, the objection overruled, and an exception taken.

The fact, if it was a fact, that Ellison, one of the defendants, was a fugitive from justice, was no part of the government's case, and evidence to prove the fact would have been inadmissible. People v. Sharp, 107 N. Y. 427, 463, 14 N. E. 319, 1 Am. St. Rep. 851; Smith v. People, 38 Colo. 509, 88 P. 453; Pulpus v. State, 82 Miss. 548, 34 So. 2; People v. Stanley, 47 Cal. 113, 17 Am. Rep. 401. And statements by the prosecuting attorney as to matters which he cannot prove or will not be allowed to prove are improper. Jones v. State, 88 Ark. 579, 115 S. W. 166; People v. Montague, 71 Mich. 447, 39 N. W. 585; State v. Kennedy, 177 Mo. 98, 75 S. W. 979.

[8] Counsel for the government suggest that counsel for plaintiffs in error should have requested the court to instruct the jury to disregard the remark. In view of the fact that the remark had received the approbation of the court, we think such action was not incumbent on counsel; furthermore, it is doubtful whether the harm could have been thus remedied.

[9] 3. After the opening statement of counsel for the government, which lasted the better part of a day, several motions were made by counsel for plaintiffs in error for a directed verdict on said opening statement, taken in

connection with the indictment. Various grounds were urged, among them that the counts of the indictment were duplicitous.

In disposing of the motions, the court made extended remarks, including the following:

"The Court: Now, let me see if I understand the indictment as explained by the opening statement. As I get it, and as I read the indictment, it is claimed and it appears that this kind of a charge is made:

"Now, one of the oldest and most common cheats and frauds that we have to deal with is a device and scheme by which a cheater or a swindler makes his victim believe that the victim can buy a piece of property or a piece of land from the swindler and the land is shown and the property is shown and through various steps and devices the victim is induced to buy what he thinks is the land and the property, but in fact he can get nothing more than a pretense of a claim to the property. No older method of cheating than that, that I know of, nor none more common in general. Sometimes such a cheat can be carried out by the cheater persuading the victim by merely showing him the land, saying, 'This is my land,' and taking money from him in the purchase of it. I have read and heard of large properties being sold to unsuspicious people by that kind of a pretense. Ordinarily, however, a mere pretense, a mere assertion that 'I own that property,' is not enough to enable me to foist it upon even the most gullible victim, and ordinarily that cheat is not consummated that way; but there it is; that is the idea. The more common way is to pick up what are to be found in every community, litigious or colorable or paper pretended titles to a piece of property, and armed with that the swindler approaches his victim and persuades the victim that he is buying the property itself. That is a common form of fraud that has been frequently brought before this court. Now, the degree to which the pretense and claim of title may be carried is, of course, unlimited, dependent upon the ingenuity of the one asking to effectuate a cheat and fraud."

"Now, as I understand it, that is the kind of a cheat that the pleader attempts to charge in this indictment, and, as he explained it in the opening statement, he says that two women had one of those litigious or paper or colorable or pretended title to large tracts of land that were situated in a definite place, and capable of ascertainment."

"Now, as I understand the charge here, it is that the defendants, finding out about the existence of this litigious, colorable, pretended claim, got together and took an interest in it, and proceeded to dress it up, camouflage it, paint it as a common brick may be painted into a gold brick, and put it into first a corporation with an immense capital stock, that was capable of division into thousands and thousands of parts, shares, and then put it further into the form of mortgage bonds, fix it up so as to appear to be the possession of a vast corporation which owned not only millions and millions of dollars worth of land, but issued bonds on only a small part of its lands, and had great resources behind the bonds in addition to the land actually mortgaged, and as so metamorphosed the original instrument of fraud—that is, the claim of the women to some land—became entirely changed in its appearance so that it looked like millions of dollars worth of stock and millions of dollars worth of bonds."

"All those millions of stock and millions of bonds were just the same old thing. They were part, as claimed here, part interest in the same old claim to vast tracts of land and no more represented the ownership of the land than did the original claim that these two women had, to start in with, but it looked a good deal more like it than the land would naturally look if that was the purpose."

"That other forms of disguise were also availed of in the manipulations of stock and bonds that had been issued and so got into different hands, but that through it all, and with the sales to the actual public and the means by which people, unsuspecting people, were actually defrauded of their money were different in form, and different in appearance, and different in color, from the original claim that [they] women had, but were essentially and actually the same old colorable claim, just split up and divided up and colored up and passed around, and passed into these corporations."

"Now, that is the way I have understood the indictment and claim, and if that is not the way the prosecutor intends it—

"Mr. Dorsey, for the government (interrupting): I think your honor has summarized much more ably than we are able to do so and we are willing to rest on that statement."

"Mr. Gurley (for defendants): It occurs to me, your honor: Mr. Dorsey stating that your honor has fairly stated what the idea of the prosecution is with reference to this indictment—

"The Court (interrupting): I don't think there is occasion for any further argument on that. It is very clear to me that they were to shape up the instrument of the fraud, the disguised or pretended claim of interest in the

land, and then take it to men who had corporations or were going to make corporations, and then through those corporations or institutions foist this claim on the public as and for a claim of real property."

We do not think these extended remarks of the court constituted simply a fair, judicial interpretation of the indictment. They come more nearly being a second opening statement for the prosecution, and the remarks of the government's counsel seem to sustain that view. And we do not think that the jury could listen to the statement made by the court relative to the case without receiving an ineradicable impression in their minds that the defendants had conspired to cheat and defraud, and that they had cheated and defrauded the persons who had purchased from them bonds and other securities.

[10] 4. Following these remarks of the court, counsel for plaintiffs in error, in accordance with the usual practice, attempted to make an opening statement to the jury. The following occurred:

"Mr. Rose: I want to make a statement for Mr. Matters, and as far as that statement covers the others it will suffice.

"The Court: How much time do you want?

"Mr. Rose: Well, your honor, you did not hold the watch on the district attorney, and I don't think it will be fair to now hold it on me. That would not be reciprocal terms.

"The Court: Well—we have got to, ultimately got to, try this case, and I don't want to take too much time in the trial.

"Mr. Rose: I will promise, your honor, I will be brief, and if I get off the case, and your honor thinks I am killing time, I hope your honor will call me, and I will be very respectful to your honor. I am satisfied your honor wants to be fair to us, and I will be fair with the court's time.

"Mr. Rose: * * * A scheme to defraud alone cannot be prosecuted under the statute referred to by the district attorney—

"The Court (interrupting): Well, let's get right down to the facts in the case. We don't care what the law is. The district attorney has stated what this indictment is.

"Mr. Rose: Yes, the district attorney has stated what this indictment is, and your honor has defined this proposition of fraud, and that alone is not indictable, but is left I think to—

"The Court (interrupting): Well, let's get right down to the facts in the case.

"Mr. Rose: I except to the refusal of the court to permit me to go into this proposition, and I give this reason: That the previous remarks of court and counsel have emphasized

the fraud, and not the misuse of the mails, which is a government institution.

"Mr. Rose (continuing): A scheme to defraud cannot alone be prosecuted—

"The Court (interrupting): Now, Mr. Rose, what's the use—that charge is here that these men camouflaged an old title to land which they did not own; pretended to own it and foisted it on the public to cheat them, and in pursuance with that scheme they put a letter in the United States mails. Now why not just answer to that charge and tell us what the facts are.

"Mr. Rose: I except to the statement of the charge which is embodied in the remarks of the court and to the rebuke from the court.

Mr. Jefferis: The defendant Stickel also excepts.

"The Court: I will limit the time for presentation of the defense to an hour. Fifteen defendants to try, and if the time is to be taken in a discussion of what the law is, at this time, and in explanations to the jury of what the laws is, we will never get through. We have got to get through ultimately.

"Mr. Rose: I except to the limitation on the ground that it is a discrimination against the defendants, when no such limitation was applied to the district attorney.

"The Court: I will withdraw the limitation, but I will urge you to go ahead and tell them what the defense is.

"Mr. Rose: I just had a foundation laid, and that was all I was going to state on this matter, and if the court will permit me I would like to state it. This act does not provide merely for the punishment of an evil intent. That must be followed by an offensive act. An act involving the misuse of the mails is an essential charge, although the main charge is a combination and conspiracy.

"Any one may withdraw from the conspiracy, and if they do withdraw before any overt act is committed, why then in that situation, there is no indictable offense. An offensive act is just as essential as a conspiracy. Now, with that foundation, the facts in this case, as I understand the proofs will show, are that in August, 1918, etc. * * *"

Mr. Jefferis, counsel for defendant Walter L. Stickel, then proceeded to make an opening statement in behalf of said defendant, during the course of which statement the following colloquy occurred:

"Mr. Jefferis: * * * This charge goes widely in point of time and space, from West Virginia to the state of Nebraska—

"The Court (interrupting): Oh, we have heard the charge and know what time and

space it covers. Why not state the facts? A man is charged with a crime, and it is up to you to state the facts constituting his defense. We have no time for anything else. Now, proceed and state the facts upon which you are relying.

"Mr. Jefferis: That is what I am proceeding to do, to state the facts that we are relying upon.

"The Court: Well, proceed and state the facts.

"Mr. Jefferis: I want to be perfectly fair with the court, and just with the jury, and I am not going to take up a lot of time uselessly, but I want to go into the facts in point of time and so forth.

"The Court: Oh, we have heard the charge and we can't go back—

"Mr. Jefferis (interrupting): Well, can't I start even from a starting point?

"The Court: No; let's go ahead with the facts that constitute the defense.

"Mr. Jefferis: I would ask for an exception, and I ask permission on the part of Walter L. Stickel to briefly state his position, commencing with the charge made against him, and I want to state the facts as they existed prior to the time it was made and now.

"The Court: I see no occasion for reiterating the charge at all. The proposition is now to relate what he relies upon for a defense.

"Mr. Jefferis: Exception.

"Mr. Jefferis (proceeding): Walter L. Stickel, the defendant in this case, for many years was engaged in the lumber and coal business in the state of Kansas. He came to the state of Nebraska and located at Kearney, I think, somewhere along in 1902 or 1903. He had held office in his town in the state of Kansas, mayor of his town at Council Grove. He so successfully conducted the business of lumber and coal—

"The Court (interrupting): Now, Mr. Jefferies, his business he may have done, and the standing he might have had down there, do not concern us in this trial. Let's get down to the facts. Now, really I want to help you in this case, I want you to suggest a definite issue as to each man, and it may be on that statement, if you state definitely what the facts are, it may be we can eliminate that man from the charge. But if you are going to start in and give the life history, and matters that have no relation to the charge, I can't help you and nobody can help you. Go ahead and state the facts.

"Mr. Jefferis: Now, I don't want to quarrel with the court—

"The Court (interrupting): Well, you can't do it, because I won't do it.

"Mr. Jefferis: The thing is, this good faith—

"The Court (interrupting): Go ahead and tell what connection Stickel had with this.

"Mr. Jefferis: It is a matter of defense what the man's business has been, and the way he looks at things is a fact.

"The Court: No; I don't think it is. Too many people have to wait—

"Mr. Jefferis: Oh, there won't be any time taken on this.

"Mr. Jefferis (continuing his statement to the jury): Well, as I say, it is a matter of defense to show his good faith. As a matter of fact he had been engaged in an honorable, upright business in this state. In some manner or way and in a business transaction he comes to the city of Omaha from his home in Kearney," etc.

In view of the repeated interruptions and restrictions, we think it can hardly be said that counsel were afforded that fair opportunity to outline the defense to which they were entitled.

[11] 5. After the trial had proceeded several days, it was brought to the attention of the court that one of the jurors, contrary to the instructions of the court, had conversed at length about some feature of the case with one of the government witnesses, and had desisted only when admonished by one of the court officers. The court stated that it would investigate the matter. The names of witnesses were furnished by counsel. The record does not disclose what evidence was taken before the court, nor the result of the investigation, but apparently the charge was found to be true, for the court again warned the jury as follows:

"It has come to my attention that at least one of the jurors so far forgot the admonition which I have repeatedly and constantly given you gentlemen, as to permit himself to be drawn into and engaged in a conversation with one of the witnesses in the case. Now, I admonish you strictly, gentlemen, against doing that."

A motion was made by plaintiffs in error to withdraw a juror or discharge the jury and continue the case. The motion was denied, and an exception taken. Later in the trial it was brought to the attention of the court that the same juror, prior to the time of the conversation above mentioned, had talked about the case to a party not a witness; and had said that defendant Matters was a crook, and that he would like to "stick him." The court

was again asked to withdraw a juror, and continue the case. This was refused.

The rebuttable presumption was that these communications by the juror with outside persons were prejudicial to the moving party. Chambers v. United States, 237 F. 513, 521 (C. C. A. 8). There is no evidence in the case that the presumption was rebutted. The least that can be said about this misconduct of one of the jurors is that it raises a grave doubt whether the constitutional right of plaintiffs in error to a trial by an impartial jury was not infringed.

[12] 6. During the cross-examination of the government witness Krebs, the following occurred:

"Q. As a matter of fact you are the person through whom they have been procuring all their data in reference to the West Virginia land? A. In regard to the ownership, I was.

"Q. And you have had charge of the West Virginia witnesses since this trial started, haven't you? A. I have not.

"Q. Haven't you been coaching them? A. I have not.

"Q. Haven't you sat here back in the corner—

"The Court (interrupting): Well, we can see where he has been sitting.

"Mr. Shotwell: I want to finish my question.

"The Court: Well, that is discretionary with the court as to how much of that kind of questioning can go on. He has given you the lines and figures and maps, and there is not call for that kind of questioning at all. You can ask him about the facts.

"Mr. Shotwell: I am going to ask him for a fact.

"The Court: Go ahead.

"Q. I will ask you, if you have not, while witnesses were on the stand—

"The Court (interrupting): No; no; no; we are not concerned with that at all. You can ask him for facts touching the controversy.

"Mr. Shotwell: Aren't we permitted to show his interest or prejudice or conduct in this trial?

"The Court: Go ahead with your inquiry touching the facts in issue here. If there are any further facts to bring out from the witness, go ahead with your inquiry. Otherwise, he may be excused.

"Mr. Shotwell: I offer to show that during the progress of this trial the witness Krebs has been sitting in this courtroom—

"The Court: What is the use of showing

that when he has been right here in the presence of the jury—

"Mr. Shotwell (interrupting and continuing): In the presence of the witnesses, and has indicated his approval or disapproval of the answers of witnesses.

"The Court: Let's go ahead and find out the facts in this case.

"Mr. Gurley: Well, that is one of the facts in this case.

"The Court: That is no fact in the case.

"Mr. Gurley: It is a fact, and we know it.

"The Court: Go ahead and inquire concerning the facts in the case. We are not here to hear anything of that kind.

"Mr. Shotwell: We except to the ruling of the court."

Another somewhat similar curtailment of the cross-examination of this same witness also occurred. Objection was taken and exception had.

Krebs was an important witness for the government. He had been instrumental in helping the government to procure its evidence on one branch of the case. The right of cross-examination is one which should not be lightly curtailed. Especially is this true where the cross-examination is not being unduly extended, nor inquiry being made touching immaterial matters. This court has clearly expressed its views on the right of cross-examination in several recent cases—Gallaghan v. United States (C. C. A.) 299 F. 172; Svarney v. United States (C. C. A.) 7 F.(2d) 515, 517.

[13] 7. In the course of its charge to the jury, which occupied more than a day, the court used the following language:

"It occurs to me that I could get the ideas before you and the principles of law more readily, possibly by reverting to an illustration which might illustrate the principles of law that are directly involved and for the purpose of illustration merely, not to reflect upon any man on trial here at all I will pick out an instance of an old fraud and swindle that you have at one time or another heard a good deal about, and use that to illustrate what the principles of law are. Suppose, for instance, that Brother Hoyt and I should make up our minds to go at a scheme to get easy money by fraud and agree upon working the old gold brick swindle, as it is called. That is remote from anything here so it cannot reflect or anybody, but it will serve as an illustration to illustrate the law involved in this case.

"Now, suppose he and I put our heads together and we are going to work the swindle

to get some easy money from some victims, and I take an old clay brick—I know something maybe about chemistry and the properties of gold, and I make a hole in the brick and I pour in enough lead or whatever I have to do to get that brick up to the specific gravity of pure gold. That is what I do. Now, as to Brother Hoyt, what does he do? He takes it after I put it up to exactly the weight of a brick of gold and puts some gold leaf on the outside of it, so that between us we get up a brick which looks the same as pure gold and weigh the same as pure gold, but still it is a common old clay brick. Then we put our heads together, say, with our friend Pearsall, to go on and get some money. We say we don't know how to get the money out of this but Pearsall says: 'I do, I know how to work the old swindle.' We say to him: 'How are you going to do it, what are you going to do, who are you going to swindle.' 'Now,' he says 'I will do that, I will undertake that end of the swindle; you fellows have got the brick fixed up now in proper shape, and I will take it and I will make the swindle and get away with it.' Then I naturally say, what do I get out of it. He says, 'I know I am going to get several thousand dollars out of this swindle and I will give you a thousand.' All right, and Brother Hoyt, he will get a thousand, and then Brother Charles would go ahead and make as much as he pleases. Then he goes ahead and we get caught, and we get before the jury. Now, what is the law?"

Again the court said:

"There is one other very important principle of law applicable. In this small circle I was using as part of the illustration it must become evident to you that the part I took in this case, in that swindle, was in itself a very innocent act, nothing more innocent than just pouring some lead into a piece of brick. That is all I did in the case I illustrated to you, and yet you know when I tried to get the thousand dollars out of it, from that brick, you know I did have a guilty intent to swindle. My act itself was innocent, but my purpose was guilty. The same way with the other party the man who fixed up the brick by putting the gold leaf on the outside of it. That is a perfectly innocent act, no law against that; but when you know he is going to try to get a thousand dollars out of some one for that, you know he has a guilty purpose. So it runs all through an inquiry of this kind. The act of itself may be perfectly innocent when considered as standing by itself, and yet coupled with other facts that you know, you may find from the evidence a guilty intent and purpose, a common guilty intent and purpose that the law denounces."

Later on in the charge the court said:

"It is not necessary, however, gentlemen, as illustrated by the crude illustration I started out with, and I want to impress on you again that I used the common instance of the gold brick swindle, not as reflecting anything said about these defendants, and you are to disregard it entirely and withdraw it from your consideration, except only to bring out clearly those principles of law that are applicable here, the necessity of proving positively that men of guilty knowledge are in the scheme such as is described in the indictment and that they conspired."

Finally, after exceptions had been taken to this portion of the charge, as well as to others, the court said:

"Gentlemen of the jury, I am persuaded that I made a serious error in using before you and picking out the common old swindle, the gold brick swindle, and using that to illustrate the points of law applicable to the conspiracy and swindling scheme. Fundamentally the mistake was that I put it up to you, but in the case I put it up to you it was merely for illustration. I did not intend, and you knew I did not intend, it to apply to these individual defendants; but the error was that in the case I illustrated, using myself and Mr. Hoyt and Mr. Pearsall here; it was a case where we were obviously guilty of that swindle, and I brought out only the rules of law applicable to a case like that, where it was a case where there was no doubt as to guilt. Now, in using these illustrations I did not go further and explain the many circumstances under which we would come together under the law. So that the net effect of it was I was putting up in illustrations of those principles of law that the government was entitled to invoke and have the jury apply in the case where there was obvious guilt. Now, in that, I, of course, did not go over and take up the defendants' side of it, so that, if there was any inference there that that illustration was intended to be complete as to those principles that are invoked by the defendants in this case, of course, it must be utterly disregarded. It was only an illustration of the principles that the government was entitled to invoke was in a case where—in the case I instanced to you—that we three were clearly and obviously guilty, and it had no application in a case like this, where the many matters of defense are laid before the jury, and I trust have been called to the jury's attention, I certainly want it to be and tried to have it so."

It requires no argument to convince that this "gold brick" illustration was unfortunate and prejudicial. This was finally conceded by the court, and the illustration withdrawn, but we entertain grave doubt whether the prejudice once created could be removed by a mere withdrawal of the words. Rudd v. United States, 173 F. 912 (C. C. A. 8).

[14] 8. In the charge to the jury relative to the evidence of good character offered on behalf of several of the defendants, including two of the plaintiffs in error, the court said:

"Proof of good character should be considered by you together with other facts that you are considering and that are laid before you in order to determine rightly the ultimate question of guilt or innocence. It may often happen that an inference is to be drawn from a given state of facts as to a man of good character which you might not draw from the same facts, some act done at any rate, by a person not shown to have such good character."

At the close of the charge, a request was made to amplify this statement by telling the jury the probative effect which evidence of good character might have. The following colloquy took place:

"The Court: But I think that I have gone as far on the question of good character as I ought to go. I will allow an exception unless government's counsel thinks I ought to go further than I did. What do you think, Judge Dorsey? I told the jury as to good character that it was a fact proven here and that it should be considered with the other facts and that it strengthened the presumption of innocence and that inferences would be drawn very often in favor of the man of good character that we would not draw in favor of a man not of good character. That seemed to me to be as far as the law contemplated that I should go, although I have in mind the decision that counsel suggests.

"Mr. Gurley: Well, what does your honor do with those decisions?

"The Court: Well, I read them in the light of many other decisions that are written in other cases and are before me. Does counsel for the government think I have gone far enough.

"Mr. Kinsler: I do.

"The Court: All right. I will allow an exception."

The value and effect of good character as a sponsor of innocence of its possessor when accused of crime, was long ago stated by this court in Times Pub. Co. v. Carlisle (C. C. A.) 94 F. 762, as follows:

" 'A good name is rather to be chosen than great riches, and loving favor rather than silver and gold.' The respect and esteem of his fellows are among the highest rewards of a well-spent life vouchsafed to man in this existence. The hope of them is the inspiration of his youth, and their possession the solace of his later years. A man of affairs, a business man, who has been seen and known of his fellowmen in the active pursuits of life for many years, and who has developed a good character and an unblemished reputation, has secured a possession more useful and more valuable than lands, or houses, or silver, or gold. Taxation may confiscate his land; fire may burn his houses; thieves may steal his money; but his good name, his fair reputation, ought to go with him to the end—a ready shield against the attacks of his enemies, and a powerful aid in the competition and strife of daily life. Every man is presumed to be innocent of wrong until he is proved to be guilty; but, when a heinous crime is charged upon a man whose character and reputation for honor and integrity have been unquestioned for years in the community in which he has lived, that character and that reputation stand sponsors for his innocence, and raise a still stronger presumption, which accompanies him in public and in private, in court and in council, and in every situation in life, and which is acted upon and recognized daily by all men— a presumption that such a man would not be guilty of such a crime."

In discussing this matter, it is to be borne in mind that counsel for plaintiffs in error did not present to the court a specific form of requested charge, but asked that the court's charge on the subject be amplified and brought within the rule approved by this court. The first inquiry, therefore, is what rule has been approved by this court; and second, whether the charge of the court was sufficient within the rule.

The leading case on the subject of good character in criminal cases is perhaps Edgington v. United States, 164 U. S. 361, 17 S. Ct. 72, 41 L. Ed. 467. In passing upon the charge of the trial court relative to good character, the Supreme Court said:

"It is impossible, we think, to read the charge without perceiving that the leading thought in the mind of the learned judge was that evidence of good character could only be considered if the rest of the evidence created a doubt of defendant's guilt. He stated that such evidence 'is of value in conflicting cases,' and that if the mind of the jury 'hesitates on any point as to the guilt of the defendant, then you have the right and should consider the testimony given as to his good character.'

"Whatever may have been said in some of the earlier cases, to the effect that evidence of the good character of the defendant is not to be considered unless the other evidence leaves the mind in doubt, the decided weight of authority now is that good character, when considered in connection with the other evidence in the case, may generate a reasonable doubt. The circumstances may be such that an established reputation for good character, if it is relevant to the issue, would alone create a reasonable doubt, although without it the other evidence would be convincing."

This rule as to the probative effect evidence of good character may have, has been followed by this court in numerous cases.

In Rowe v. United States (C. C. A.) 97 F. 779, the trial court had charged the jury: "In cases where the facts themselves establish either guilt or innocence, character is not admissible, and cannot avail." This court in its opinion said: "This was clearly erroneous. Evidence of the good character of an accused may itself produce in the minds of the jury a reasonable doubt as to his guilt."

After quoting with approval from a charge of Judge Dillon in United States v. Babcock, 3 Dill. 581, 620, Fed. Cas. No. 14,487, as follows: "In the language of an eminent judge, speaking upon this point: 'There may be cases so made out that no character can make them doubtful; but there may be others in which evidence given against a person without character would amount to conviction, in which a high character would produce a reasonable doubt; nay, in which character will actually outweigh evidence which might otherwise appear conclusive' " —this court then cited the rule in Edgington v. United States, supra, and concluded by saying:

"If the jury are not convinced of the guilt of the defendant beyond a reasonable doubt, then it is their duty to render a verdict of not guilty, without any evidence as to his good character. The object of introducing evidence of the good character of the accused is for the purpose of raising a reasonable doubt in the minds of the jury as to whether a man who has built up such a character in the community in which he lives is likely to be guilty of the crime with which he stands charged."

The rule in the Edgington Case has been recognized by this court in Humes v. United States (C. C. A.) 182 F. 485; Searway v. United States (C. C. A.) 184 F. 716; Warren v. United States (C. C. A.) 250 F. 89; Winter v. United States (C. C. A.) 13 F.(2d) 53; Linde v. United States (C. C. A.) 13 F. (2d) 59.

Evidence of good character is of especial value in cases like the one at bar, where the element of intent to defraud is involved. The authorities are conflicting on the question whether a defendant in whose behalf evidence of good character has been introduced, is entitled to an instruction in the exact words used in the opinion in the Edgington Case, viz.: "The circumstances may be such that an established reputation for good character * * * would alone create a reasonable doubt, although without it the other evidence would be convincing." For an exhaustive review of the authorities see Kreiner v. United States (C. C. A.) 11 F.(2d) 722. This court is committed to the negative view. Warren v. United States, supra; Winter v. United States, supra; Linde v. United States, supra.

However, the question of the right of plaintiffs in error to have an instruction in those exact words is not involved in this case. Neither that specific form nor any other specific form of instruction was presented to the court. The request was for an instruction which should recognize the rule approved by this court. That rule, as we have seen, is the rule of the Edgington Case; and the rule of the Edgington Case, laying aside technical verbiage, is this: That where evidence of good character is introduced in behalf of the defendant, he is entitled, and especially if request is made, to an instruction setting forth (1) the purpose and function of such evidence, viz. to generate a reasonable doubt; and setting forth (2) the probative status of such evidence, viz. that it is entitled to be considered whether the other evidence in the case be clear or doubtful; and setting forth (3) the possible effect of such evidence, viz. that when it is considered with the other evidence, if a reasonable doubt is created as to defendant's guilt, he is entitled to an acquittal. We are constrained to hold that the charge given in the instant case did not properly fulfill any one of these requirements.

[15] Furthermore, whatever virtue there was in the charge as given, was completely nullified by another and later portion of the charge, where in speaking of the outline and description of the scheme contained in the indictment, the following language was used:

"It pictures to you as a necessary implication of the general description that there shall be men of reputation and standing involved in the scheme, because the undertaking to market and float and exploit among the public such a large amount of securities as are here involved could not in that way be done unless there were men of standing and reputation interested in it, such men as could engage

in the banking business at the corner of Sixteenth and Farnam, and in the Securities Company doing business there, and in Lincoln and so forth. There is that fair implication."

A charge of a somewhat similar character was given by the trial court in the Humes Case, supra, and the language of this court in reference thereto is apposite here (page 489) :

"The learned trial judge, instead of giving the defendant the advantage to which good character, if established, entitled him, advised the jury in effect that it was a positive disadvantage to him. Instead of advising them that good character should be considered in connection with all the other evidence in determining the ultimate issue of defendant's guilt or innocence, he in effect told them that the possession of good character would aid him in perpetrating the fraudulent scheme with which he was charged. In this way he turned what the law makes a shield, into a sword. This was clearly error of a prejudicial kind and necessitates a reversal of the judgment." See, also, Perara v. United States, 235 F. 515 (C. C. A. 8), 10 A. L. R. 1.

[16] 9. It is further contended that the charge to the jury was so argumentative as to prevent plaintiffs in error from having a fair trial. Throughout the charge to the jury are such expressions as " 'The evidence justifies the claim of the government;' 'The government is justified apparently in claiming;' 'The evidence further discloses;' 'The evidence further shows;' 'It is further shown to me clearly by the evidence;' 'The evidence would further indicate to me;' 'I find little dispute about it in the testimony.' "

While the judge in the federal courts "may comment on the evidence and may express his opinion on the facts, provided he clearly leaves to the jury the decision of fact questions" (Weare v. United States, 1 F.[2d] 617 [C. C. A. 8], and cases cited), yet, as was said in the same case, "the instructions, however, should not be argumentative. The court cannot direct a verdict of guilty in criminal cases, even if the facts are undisputed. Dillon v. United States (C. C. A.) 279 F. 639. It should not be permitted to do indirectly what it cannot do directly, and by its instructions to in effect argue the jury into a verdict of guilty." See, also, Parker v. United States, 2 F.(2d) 710; Cook v. United States (C. C. A. 8) 18 F.(2d) 50.

[17] We think the charge in the case at bar, taken as a whole, was clearly argumentative. [18] While each of the foregoing matters has its own separate status and relative position of importance, yet we have grouped them together, because they all have a bearing upon the broad question whether there was a fair trial. Though the record does not show that any objection was taken in relation to some of the matters mentioned, yet in pursuing the broad inquiry, whether a fair trial was had, we feel at liberty to examine the record as a whole without regard to objections.

[19] The term "fair trial" is often used, but not often defined. It is of broad scope. While we shall not undertake to give a formal definition of the term, yet it may not be amiss to mention, in part at least, its content. It means a trial conducted in all material things in substantial conformity to law. People v. Wolf, 183 N. Y. 464, 76 N. E. 592; Nichols v. State, 10 Okl. Cr. 12, 133 P. 256.

It consists not only in an observance of the naked forms of law, but in a recognition and just appreciation of its principles. State v. Pryor, 67 Wash. 216, 121 P. 56; Egan v. United States, 287 F. 958, 971, 52 App. D. C. 384. It means a trial before an impartial judge, an impartial jury, and in an atmosphere of judicial calm. State v. Weldon, 91 S. C. 29, 74 S. E. 43, 39 L. R. A. (N. S.) 667, Ann. Cas. 1913E, 801; State v. Gossett, 117 S. C. 76, 108 S. E. 290, 16 A. L. R. 1299. Being impartial means being indifferent as between the parties. Omaha & R. V. R. Co. v. Cook, 37 Neb. 435, 55 N. W. 943. It means that the acts and language of the prosecuting attorney are subject to control; that his duty consists, not in securing conviction at all hazards, but in ascertaining the truth. Nichols v. State, supra; People v. Wolf, supra; People v. Gotshall, 123 Mich. 474, 82 N. W. 274; Wilson v. State, 87 Neb. 638, 128 N. W. 38. It means that the defendant shall have a fair opportunity through his counsel to outline his defense to the jury. It means that the right of cross-examination shall be respected. Gallaghan v. United States, supra; Svarney v. United States, supra; People v. Brady, 56 Cal. App. 777, 206 P. 668. It means that, while the judge may and should direct and control the proceedings, and may exercise his right to comment on the evidence, yet he may not extend his activities so far as to become in effect either an assisting prosecutor or a thirteenth juror. Weare v. United States, supra; Rudd v. United States, supra; Parker v. United States, supra. It means that, if evidence of good character of the defendant is introduced, an adequate instruction to the jury shall be given touching the probative value of such evidence.

[20] When the record in the case at bar is viewed in the light of the foregoing principles, we think it clearly discloses that the defend-

ants did not have the fair and impartial trial to which they were entitled.

### Other Assignments of Error.

There are assignments of error directed to other portions of the charge to the jury than those which we have considered, but we think it unnecessary to discuss them.

There are also many assignments of error relative to the admission of evidence. Most of them are of such character that they are not likely to occur on another trial. We pretermit discussion of them. It may not be amiss, however, to call attention to the fact that a large part of the evidence relating to the title of the lands in West Virginia was clearly inadmissible. Some of it consisted of documents not properly authenticated; some of it consisted of hearsay evidence embodied in a certain map or plat prepared by one of the witnesses; some of it consisted of the opinions of lay witnesses as to the ownership of lands which concededly did not belong to themselves. Doubtless all such errors will be corrected on another trial, without the necessity of any discussion here.

### Statute of Limitations.

[21] Defendant Matters interposed the defense of the statute of limitations. It is claimed that Matters severed his connection with the plan or scheme, if there was one, more than three years prior to the return of the indictment, February 2, 1923. The evidence tends to show the following state of facts:

Matters had received an allotment of securities of the Colonial Company for his services. He entered into a contract of sale of said securities with Stickel on June 4, 1919. No stock or bonds had been issued at this time. The bonds were dated November 1, 1919. Under the contract of sale, Matters received certain payments from Stickel, the last one being on November 15, 1919. By an arrangement made June 6, 1919, between Matters and Stickel, certain other payments under said contract of June 4, 1919, were to be made by Stickel to members of Matters' family to reimburse them for moneys formerly advanced to Matters. Drafts were drawn representing these payments to be made to the various members of the family, and these drafts were accepted by Stickel. On December 6, 1919, a supplemental contract was made, to which Matters, the members of his family who were to receive the several payments, and Stickel were all parties. This supplemental contract extended the time of payment for certain of the drafts until December 15, 1920.

It is claimed by Matters that he had no interest in any of the securities or property of any of the companies involved in the alleged scheme after the payment he received on November 15, 1919, and that the contract of December 6, 1919, was in effect merely a contract between Stickel and the members of Matters' family who were to receive the payments. It is to be noted, however, that this supplemental contract continued in force and effect all of the provisions of the original contract of sale of June 4, 1919, except as to the time and manner of payment; and it is to be further noted that one of the provisions of the original contract was that, if default was made in any of the several payments, the stock and bonds belonging to Matters and which were placed in escrow, should be returned to him, and all payments made should be considered as liquidated damages. Furthermore, in August, 1920, part of the Stickel drafts held by members of Matters' family were exchanged for bonds of the Guaranty Securities Company, and Matters signed a receipt for the bonds. It is claimed by the government that this shows that Matters was interested at least as late as August, 1920.

Finally, it must be noted that, though Matters did not take the stand on the trial, yet testimony given by him in the state court in another case was read upon the present trial without objection. In that testimony appears the following: "I have not explained the date when I made the final settlement for the purchase money consideration with Mr. Stickel for the purchase price of my interest under the contract of June, 1919. I made final settlement with Mr. Stickel, September 1, 1920. Between the date of my contract June 4th—I have never released in any manner or authorized the disposition of any of the stock or bonds which by my contract of December, 1919, I provided should remain as collateral security for the payment of the purchase price. I never authorized the delivery of my interest in this sale contract by the escrow owner to W. L. Stickel until September 1, 1920."

This again is claimed by the government to show that Matters had an interest in the whole transaction as late as September, 1920. As above stated, the indictment was returned February 2, 1923, so that, if Matters continued to be connected with the transaction, or had a continuing interest therein, as late as February 2, 1920, the defense of the statute of limitations would not avail. Hyde v. United States, 225 U. S. 347, 368, 369, 32 S. Ct. 793, 56 L. Ed. 1114, Ann. Cas. 1914A, 614. We think that the matter of such defense was at

best a question for the jury, and it was so submitted. We think there was no error in denying a motion for a directed verdict in behalf of Matters.

In view of the necessity for a new trial, we have thought it best not to discuss the evidence, except so far as pertinent to a disposal of those assignments of error which we have considered. For the reasons above set forth, the judgment must be set aside as to the several plaintiffs in error, and a new trial granted.

It is so ordered.