The UNITED STATES of America,
Plaintiff-Appellee,

v.

Alvin A. SCHULTZ, Defendant-
Appellant.

No. 11584.

United States Court of Appeals
Seventh Circuit.

Aug. 17, 1956.

James A. Sprowl, John D. Knodell, Jr., Chicago, Ill., for appellant. Johnston, Thompson, Raymond, Mayer & Jenner, Chicago, Ill., of counsel.

Robert Tieken, U. S. Atty., Frank J. McGarr, Asst. U. S. Atty., Chicago, Ill., for appellee. John Peter Lulinski, Asst. U. S. Atty., Chicago, Ill., of counsel.

Before DUFFY, Chief Judge, and FINNEGAN and SWAIM, Circuit Judges.

DUFFY, Chief Judge.

Defendant was tried and convicted upon Count 3 of an indictment which charged defendant and one Sims with "knowingly and with intent to defraud, did negotiate and transfer to and upon the Harris Trust and Savings Bank of Chicago, Illinois, for value, a bill of lading containing a false statement as to the receipt of goods, * * * and that at the time the defendants did negotiate and transfer the said bill of lading as aforesaid, they then and there well knew it to contain a false statement: in violation of Section 121, Title 49, United States Code [49 U.S.C.A. § 121]." On motion of the government the indictment was dismissed as to defendant Sims.

As to the transactions described in the indictment, defendant did not deny nego-

tiating and transferring a bill of lading to Carrier Corporation which contained a false statement as to the receipt of the goods, but he strenuously insisted he did so without intent to defraud. His defense was that Carrier knew of the fictitious character of the bill and either suggested it or agreed to it. Defendant argued that Harris Trust and Savings Bank was merely acting as a disbursing agent for Carrier, and that if any transfer were proven, it was to Carrier and not to Harris.

Defendant, a University graduate, with no previous criminal record, had been an inspector for the Chicago Ordinance District and an instructor in radio engineering for the Army Air Force Technical Training Command. In 1946, after the conclusion of the war, defendant started a manufacturing business. Later, he and his wife organized "Manufacturers' Representatives, Incorporated," which bought and sold steel and other products then in short supply. In March, 1950, defendant leased a fully equipped rolling mill in Indianapolis, Indiana. Defendant employed an experienced steel production man to operate the plant.

In 1950, defendant met one Anderson, the Director of Procurement of Carrier Corporation which, at that time, was desperately in need of steel such as could be produced in the Indiana plant. Anderson testified: "Those were very critical times from a material standpoint, and getting actually into a rolling mill that could produce steel was something that delighted me very much." Then followed a series of business transactions between Carrier Corporation and defendant which, in ordinary times, would have been considered unorthodox if not fantastic.

Carrier first advanced defendant $70,-000.00. Later, Anderson took defendant to Keller, the treasurer of Carrier Corp., who gave defendant a check for $44,000.-00 for 315 tons of sheet bar not at that time purchased or even located by the defendant. Other transactions followed which showed that Carrier actually was financing the defendant in his operations.

During the same period that Anderson, Schultz and Keller were working out the transaction set out in the indictment herein, Carrier was also making arrangements to purchase fifteen hundred tons of copper scrap through the defendant. Carrier was prepared to advance defendant $750,000.00 to buy this copper, but the deal fell through because a government order was issued which prohibited further conversion deals.

■ Most of the testimony as to the transactions hereinbefore detailed was rejected by the Court. The deals were risky and under ordinary conditions, were completely unorthodox. The same Carrier officials who dealt with the defendant in the transaction here in question, were the officials who carried out these unusual business transactions. They all occurred within a period of about seventy days prior to the transfer of the bill of lading in question. Under the circumstances of this case, where the intent of the defendant was a vital element, it was error to have excluded these transactions from the jury.

■ During the course of the trial, in ruling upon an objection to certain testimony, the trial court said in the presence of the jury: "My viewpoint is that it is not particularly harmful because if a man were charged with—now this is far distant thing, but suppose a man were charged with committing a robbery, and then the next day he went and took the money back, every cent of it. He might still be found guilty in such an instance, even though he returned every cent of it." Defendant's counsel promptly objected.

The illustration used by the court was unfortunate and prejudicial. In fact, in the charge to the jury the court termed it "inept." The court instructed "Counsel for the defendant correctly excepted to the remark and I sustained the exception, and I instruct the jury to disregard it because I did not mean in any way to compare this case, this type of a case, with that type of case. It would be more proper probably to say, suppose I were

to go over to Peacock's somewhere and slip my hand in, and got a big diamond ring and took it home and then, after thinking it over, the next day I took it back. * * *." Defendant's counsel again objected.

The second illustration was very little improvement on the first. It is likely the court's remarks made a dramatic impression on the jury. They were confusing on the over-riding issue of whether defendant had an intent to defraud. We think the illustrations used by the court were prejudicially erroneous. Sunderland v. United States, 8 Cir., 19 F.2d 202.

We have considered defendant's claim of variance, but overrule same.

Judgment reversed and remanded for a new trial.

FINNEGAN, Circuit Judge (concurring).

Count III of the indictment here on review is bottomed on section 41 of an Act of Congress, 39 Stat. 544, 49 U.S.C.A. § 121 (1952 ed.) relating to bills of lading, and providing in its phases relevant here:

"That any person who, *knowingly or with intent to defraud* * * * *or with like intent* * * * negotiates or transfers for value a bill which *contains a false statement as to the receipt of the goods*, or as to any other matter, or who, with intent to defraud, violates, or fails to comply with, or aids in any violation of, or failure to comply with any provision of this Act, shall be guilty of a misdemeanor, and, upon conviction, shall be punished for each offense by imprisonment not exceeding five years, or by a fine not exceeding $5,000, or both." (Italics added.)

Schultz, defendant, was convicted under that count which, in substance, charges that he "knowingly and with intent to defraud" negotiated and transferred to and upon the Harris Trust and Savings Bank, a bill of lading containing a false statement as to the receipt of goods. The short of it is, quoting directly from defendant's brief: "That the defendant negotiated and transferred for value a bill of lading to Carrier Corporation *which contained a false statement as to the receipt of the goods*, defendant freely admitted at the trial; that he did so with any intent to defraud, he denied. His defense was that Carrier Corporation asked him to do exactly what he did * * *" (Def. brief, 50). In other words Schultz insists he did not have the state of mind required under the statute.

Here the *actus reus* proscribed by § 41 is the negotiating or transferring a bill of lading containing a false statement as to the receipt of the goods. This element was established by the prosecution. But for criminal guilt there must be a union of *mens rea* (here an intent to defraud) and the *actus reus*. The critical part of this case then, lies in the state of mind with which Schultz acted. Yet evidence, parol and documentary, proffered by the defense concerning dealings between Schultz and Carrier were rejected at the trial level; this was error. For this reason, among others, some of the jury instructions were confusing, especially when compounded with certain illustrations offered by the presiding judge.

Finding reversible errors committed below, I think we have no other course than to reverse the judgment appealed and remand the case for a new trial. Accordingly, I would refrain from commenting on, or delineating the facts.